IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELLEN COWEN, | ) | |
| | ) | No. 12 C 7548 |
| Plaintiff, | ) | |
| | ) | Magistrate Judge Arlander Keys |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| , | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | | |

<u>MEMORANDUM OPINION AND ORDER</u>

This case is before the Court on Ellen Cowen's motion for summary judgment.  She seeks a remand or reversal of the Commissioner's decision to deny her application for Disability Insurance Benefits and Supplemental Security Income, arguing that the Administrative Law Judge's (1) residual functional capacity finding is unsupported by substantial evidence; (2) credibility determination is unsupported by substantial evidence; and (3) Step 5 determination is unsupported by substantial evidence.  For the reasons set forth below, Plaintiff's motion is denied, and the decision of the Commissioner is affirmed.

<u>BACKGROUND</u>

On January 25, 2010, Plaintiff, Ellen Marie Cowen, applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") at the age of 41.  She claims to have become disabled as of October 1, 2005, due to a broken wrist, bipolar disorder as well as other mental impairments, and diabetes.  (R. at 21.)  Her application was denied initially and upon reconsideration.  (R. at 21.)  Mrs. Cowen requested a hearing before an administrative law judge, and the case was assigned to ALJ Patricia Witkowski Supergan, who held the requested hearing on September 12, 2011.  (R. at 21).

I. Plaintiff's Hearing Testimony

At the hearing before the ALJ, Mrs. Cowen appeared along with her husband, Mr. Steven Cowen, and was represented by counsel, Mr. Jeremy Blain.  (R. at 44.)  Mr. Blain specified that the treating physician for Ms. Cowen's foot, Dr. Serpe, had not submitted the entirety of his treatment notes; the ALJ allowed 30 more days for those documents to be received. (R. at 46.)  Mrs. Cowen then testified to the following: she lives in an apartment with her husband and their two sons, ages 20 and 24. (R. at 47.)  She completed high school, taking all special education classes.  She did not obtain any further education or vocational training beyond high school. (R. at 48.)  She does not possess a driver's license, but her husband does.  (R. at 66.) She smokes a half a pack of cigarettes per day, and has been doing so for the past twenty years. (R. 67.)  She very rarely

2

drinks alcohol and does not use any drugs. *Id.* She does not use computers, but does own a cell phone. *Id.*

With regard to her home life, she completes the household chores with the assistance of her two sons. (R. at 66.) Her eldest son works, but the youngest does not. Her husband has been on oxygen "for a while," she is unsure of exactly how long. *Id.* For leisure, she does not read, but does watch a "little bit" of television. (R. at 67.) Her husband cooked dinner the night before the hearing, and over the weekend she mostly slept and sat in her chair watching television. *Id.* In addition to sleeping at night, she on average sleeps three hours during the day, as well. (R. at 60.) Her medications, including Ultram, Clonazepam, and Trazodone, all cause her to feel sleepy. (R. at 61.) She sometimes needs assistance with personal care. (R. at 63-64.) For instance, her husband helps her get undressed because her shoulders do not go all the way up. (R. at 64.)

With regard to work history, she previously worked as a bus driver. (R. at 65.) She stopped driving the bus because it was "getting too much for me on my back from the sitting and bouncing." *Id.* Afterward, she worked at a pizza factory until she fell and broke her left wrist badly while on the job. (R. at 49, 66.) She went through Workman's Compensation, but after everything was finalized and she tried to return to her job, she was denied. (R. at 66.) She attempted to procure another job,

3

but was unsuccessful. *Id*. She does not believe she could work a full time job of any sort, even sedentary, at this point; all the walking, standing, and sitting would be too much for her. (R. at 64.)

With regard to her physical impediments, her main issues are her right foot, left wrist, and lower back. (R. at 49.) The bone in her foot is breaking down due to her diabetes and she has to wear a boot and use a bone stimulator. (R. at 51.) Dr. Serpe is the treating physician for her foot; she has been seeing him for about a year. *Id*. She had been wearing the boot about three months and using the bone stimulator for two. *Id*. She hopes this will remedy the issue so that she will not have to pursue surgery, which Dr. Serpe suggests as a last resort. (R. at 52.) Her foot causes her to not walk right, and she "knows there's no way I could walk for a long time on it." *Id*. After 15 minutes of walking, she needs a 10 minute resting break before she can walk again. (R. at 52.) She cannot stand long, as it becomes too painful. *Id*.

Even after wrist surgery, her left wrist continues to pain her, and she cannot bend as much as she can with her right, non-injured wrist. (R. at 53.) She does not have difficulty holding things, doing buttons, or the like, however, the pain is what impedes her. *Id*. She takes Ultram to reduce this pain. *Id*. She had not had any treatment on her wrist for two months.

4

During her last examination Dr. Cola, while examining, pinched her nerve. (R. at 54.) He recommended Ultram for the pain. *Id*. There was no suggestion made for physical therapy. *Id*.

Her back had been gradually bothering her over the past three years. (R. at 54.) It had been "a while" since she had an MRI of her back, but she had injections administered into it at the Pain Clinic, which offered some relief. (R. at 54, 68.) Her last injection was a year ago, after which she stopped because there was nothing more she [Dr. Maly] can do for me." (R. at 55.) However, she had an appointment to get another injection in her back the next week. (R. at 68.) She periodically changes positions -stands, sits, and lays down in order to relive her back pain. *Id*. During the hearing she stood at one point in order to relieve her pain. Id. Her pain is not constant, but comes and goes. Id. She takes Ultram about every six hours in order to keep the pain away. (R. at 55-56.) If she did not take the Ultram, her pain would be constant. (R. at 56.) Being in a seated position is most comfortable, and it is how she spends the majority of her time. *Id*. After about a half hour of sitting, however, a pinching pain causes her to need to change positions. (R. at 56.) She lies down for an hour, and then returns to sitting. *Id*.

She has had diabetes for the past 15 years. (R. at 65.)

5

She began taking pills for her diabetes 10 years ago, and was put on insulin a year ago. *Id*. If she doesn't eat right or stay on top of her medication, her blood sugar crashes on her and it takes about a half hour to get back to normal. (R. at 57-58.) The diabetes causes her pain in her feet which consistently comes and goes. (R. at 58.) She takes Ultram to combat the pain. *Id*. Her blood sugar was 190 and that is typical "some days." (R. at 65.)

With regard to her mental impediments, she is bipolar, experiences mood swings, and takes medication in order to sleep. (R. at 50, 58.) She "can get very depressed very easily or I get mad very easily." (R. at 58.) When on her medication, she does not often experience these episodes; however, her medication makes her sleepy. (R. at 58-59.) She experiences mental health problems about once a month. (R. at 59.)

She has sleep apnea and uses a BIPAP machine in order to help her sleep. (R. at 60.) She has asthma, particularly during the summertime, and combines Symbicort with her air every day in order to alleviate it. (R. at 61.) She on average has problems with her asthma once a month, and will at that time utilize a nebulizer. (R. at 61-62.) She was last hospitalized because of her breathing a year ago. (R. at 62.)

With regard to socialization, she occasionally has difficulty being around people, as they can easily irritate her.

6

(R. at 62.) At least once or twice a day someone that she knows gets on her nerves and she yells. (R. at 63.) She occasionally has problems concentrating, and will forget what she is doing. *Id.*

## II. Vocational Expert's Hearing Testimony

The ALJ also heard testimony from Pamela Tucker, a Vocational Expert ("VE") who reviewed Mrs. Cowen's work record and exhibit file and heard her testimony before the ALJ. The VE testified that Mrs. Cowen's past work as a bus driver constituted a medium, semi-skilled, SVP:4; with the Dictionary of Occupational Titles ("DOT") listing of 913.463-010. (R. at 71.) Her next job at the pizza factory is classified as a machine packer and is a medium, unskilled job with a SVP:2 and DOT listing of 902.685-078.

The ALJ then asked the VE to assume that a hypothetical person with the same age, education, and work experience as Ms. Cowen had the residual functional capacity to perform medium work as defined in the regulations, and said individual could perform unskilled work tasks that could be learned by demonstration or in 30 days or less; would such an individual be able to perform any of Mrs. Cowen's past relevant work? (R. at 71.) The VE responded that such an individual would be able to perform Mrs. Cowen's past work as a machine packer, and that 2,500 of those positions exist in the Illinois regional economy; 70,000 in the

7

national economy. (R. at 71-72.) Moreover, the VE testified that such a person would also be able to work as a kitchen helper (16,000 regionally/215,000 nationally) or as a packer (8,000 regionally/118,000 nationally). (R. 72.)

Next, the ALJ posed the following hypothetical to the VE: assume an individual the claimant's age, education, and work experience; could perform only light work as defined in the regulations; could occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; the individual could occasionally balance, stoop, kneel, crouch, and crawl; the individual would need to avoid concentrated exposure to extreme cold, heat, wetness, humidity, and fumes; and the individual could perform unskilled work tasks that could be learned by demonstration or in 30 days or less. (R. at 73.) The ALJ asked the VE would there be jobs for such an individual, to which the VE responded favorably. She testified that such an individual would be able to work as an assembler (2,000 regionally/14,000 nationally) or as a lathe operator (2,200 regionally/21,000 nationally). *Id*.

The ALJ then asked the VE if she were to limit this hypothetical individual to the sedentary level of exertion with all the same postural, environmental limitations, would jobs still exist. The VE testified that such a person would be capable of performing three sedentary, unskilled jobs with a SVP:2: call out operator (1,200 regionally/35,000 nationally),

8

telephone quotation clerk (900 regionally/10,000 nationally), and an address clerk (1,000 regionally/70,000 nationally). (R. at 74.) The VE testified that the number of available positions would remain the same even if this individual had to rely on a walking boot. *Id.*

However, the VE testified that, if the individual needed to change position from sitting to standing on an hourly basis for about five minutes, that would affect the availability of the positions as follows: the assembler position would decrease to 900 regionally/5,500 nationally; labeler to 1,000 regionally/ 9,000 nationally; lathe operator 10 1,000 regionally/8,500 nationally; call out operator 700 regionally/28,000 nationally; address clerk 500 regionally/34,000 nationally; telephone quotation clerk 400 regionally/4,000 nationally. (R. at 75.)

The ALJ asked if she were to further limit this individual to occasional contact with the general public and occasional interactions with supervisors and co-workers, what affect would such limitations have on the number of positions and jobs available. The VE testified that said limitations would eliminate the call out operator and the telephone quotation clerk, but the individual would be able to perform the work of a medical eye drop assembler with 850 regionally/7,000 nationally or as a document preparer with 1,200 regionally/43,000 nationally. (R. at 75.)

The VE explained that, with regard to absences, generally a person cannot miss more than approximately one day per month. (R. at 76.) With regard to breaks, the VE testified that generally a worker gets two fifteen minute breaks, one in the morning and in the afternoon, as well as a thirty minute lunch break. (R. at 76.) The VE testified that if someone were to exceed these customary accommodations, it would not be tolerated. *Id.*

Finally, Plaintiff's attorney questioned the VE regarding the positions available as an eye drop assembler and a document preparer if the previous hypothetical also included a need to change positions. The VE testified that the numbers would then decrease for the eye assembler position to 450 regionally/3,400 nationally, and for the document preparer to 800 regionally/ 22,000 nationally. (R. at 77.) Additionally, the VE testified that, if that hypothetical also included the limitation that the individual could only use her left hand occasionally to handle and finger, then all of the positions would be eliminated. *Id.*

<u>III. Medical Record</u>

In addition to the testimony of Mrs. Cowen and the VE, the record before the ALJ includes the medical records of various treating and non-treating physicians.

*i. Dr. Mary Belford of Psychiatric Associates*

On March 7, 2006, Mrs. Cowen was treated by Mary Belford, M.D. (R. at 277-79.)  On examination, Dr. Belford found that Plaintiff was anxious, flat, and sad but used appropriate judgment and insight, as well as normal abstract reasoning.  (R. at 278.)  Dr. Belford diagnosed Mrs. Cowen as suffering from major depressive disorder recurrent; she discussed the benefits of exercise, the need for her to quit smoking up to two packs of cigarettes per day, and prescribed Paxil. (R. at 278.)  From April 18, 2006 to March 13, 2008, Dr. Belford diagnosed Plaintiff as suffering from recurrent major depressive disorder. (R. 280, 282-84, 286, 288, 290, 292, 296.)  On February 2, 2009, Dr. Belford clinically assessed Ms. Cowen and found that she was anxious, flat, evasive; and had a "mild depressed affect"; she was treated and diagnosed then and on October 28, 2009, with major depressive disorder recurrent  (R. at 301-02, 311.)

On February 16, 2010, Dr. Belford completed a mental capacity assessment form diagnosing Mrs. Cowen with major depression recurrent, and noting that she had marked limitations understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with or in proximity to others without being distracted by them; completing a normal workweek without interruptions from psychologically

11

based symptoms; performing at a consistent pace with a standard number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others. (R. 266-69.) Dr. Belford opined that Plaintiff would likely need to be absent more than four times a month. (R. 267.)

From February 24, 2010 to September 14, 2010, Mrs. Cowen was treated by Dr. Belford and diagnosed as suffering from major depressive disorder recurrent. (R. at 312-13.) On December 14, 2010, however, Dr. Belford diagnosed Plaintiff as suffering from bipolar II disorder. (R. at 444-45, 448-49.) Dr. Belford stressed the importance of compliance with the agreed upon course of action with Mrs. Cowen, explaining that untoward health could result in her not following through. (R. at 445.)

On March 15, 2011, Dr. Belford completed a mental capacity assessment form. (R. at 490-92.) Dr. Belford opined that Plaintiff had moderate limitations remembering locations and work-like procedures; understanding and remembering detailed instructions; carrying out detailed instructions; working in

12

coordination with or in proximity to others without being distracted by them; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; being aware of normal hazards and taking appropriate precautions; and setting realistic goals or making plans independently of others. *Id.* Mrs. Cowen had marked limitations maintaining attention and concentration for extended periods; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace with a standard number and length of rest periods; accepting instructions and responding appropriately to criticism; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; and traveling in unfamiliar places or using public transportation. *Id.* Dr. Belford also opined that Mrs. Cowen would likely still be absent more than four days a month. (R. at 491.)

Mrs. Cowen was last treated by Dr. Belford on June 14, 2011. (R. at 503-04.) She diagnosed her with major depressive disorder, recurrent episode, in partial or unspecified remission. (R. at 503.) Mrs. Cowen had not been having trouble getting her prescriptions filled, and Dr. Belford recommended no changes to

her regimen of Trazodone, Cymbalta, Klonopin, Lamcital, and
Abilify. *Id.*

## ii. Dr. Maly of the Pain Care Center

Mrs. Cowen was first seen as an outpatient by Jasmine Maly,
M.D. on March 25, 2008. (R. at 482-84.) On examination, Dr.
Maly found that Plaintiff experienced pain on the right side of
her thigh and leg when straight leg raising was to 70 degrees;
"[e]xtension [was] . . . painful[;]" and Plaintiff experienced
paraspinal and sacroiliac tenderness. (R. at 483.) Dr. Maly also
found Plaintiff tested positive on the Gaenslen and Patrick
tests. *Id.* Dr. Maly diagnosed Mrs. Cowen as suffering from
lumbar facet syndrome and believed it to be reasonable to
schedule her for lumbar facet block L3 through S1 on the right
side. *Id.*

A May 15, 2008 examination by Dr. Maly found that Mrs. Cowen
experienced sacroiliac tenderness and trigger points were
elicited in her lower back. (R. at 478.) Dr. Maly diagnosed
Plaintiff as suffering from right sacroiliac pain and myofascial
pain. *Id.* From December 9, 2008 to January 23, 2009, Mrs. Cowen
was treated by Dr. Maly. (R. at 473, 475.) On examination, Dr.
Maly found that Plaintiff experienced "tenderness in the right
upper shoulder area" and sacroiliac tenderness. (R. at 473,
476.) She also found the Patrick's test was positive. (R. at
475.) Dr. Maly diagnosed Mrs. Cowen as suffering from right

14

shoulder pain; cervical radiculopathy; bilateral sacroiliac pain; sacroiliac joint dysfunction; and depression. (R. at 473, 475.)

On January 30, 2009, an MRI of Mrs. Cowen's cervical spine revealed "[m]ild central disc bulging at the C6-C7 level" and "[n]eural foraminal narrowing on the right mainly due to osteophyte formation at the C5-C6 level." (R. at 470.) On February 6, 2009, Dr. Maly found that Mrs. Cowen experienced tenderness in the shoulder area; she diagnosed her as suffering from cervical radiculopathy. (R. at 469.)

On December 14, 2009, Plaintiff returned to Dr. Maly who found, "groin tenderness in the medial aspect and mild allodynia." (R. at 465.) Dr. Maly diagnosed Ms. Cowen as suffering from "neuropathic pain-right groin-right lower extremity." *Id.*

### iii. Dr. Serpe of the Riverside Medical Center at Peotone

From July 21, 2008 to August 3, 2011, Mrs. Cowen was treated intermittently by Jason Serpe, D.P.M. (R. at 515-15, 529-34.) Dr. Serpe diagnosed her as suffering from the tenosynovitis of her foot/ankle. (R. at 530, 533-34.) On May 24, 2009, Dr. Serpe treated Mrs. Cowen and found that she had no issues with her toes, no effusion, but that she experienced pain on palpation at "the lateral aspect of the [right] ankle in the area of the sinus tarsi joint." (R. at 528.) Dr. Serpe explained to Mrs. Cowen that she needed to wear the brace ordered in an effort to

decrease her instability, and he also discussed the possibility of physical therapy, to which Mrs. Cowen said she did not think she had time for. (R. at 528.)

A couple years later, on March 8, 2010, Mrs. Cowen was again treated by Dr. Serpe, he found "moderate 1st metatarsophalangeal joint ("MTP")] tenderness" and "generalized pain in the area of the first metatarsal shaft." (R. at 525-26.) On March 23, 2010, a view of Plaintiff's right foot revealed "[h]ypertrophic degenerative changes of talonavicular joint." (R. at 522.)

On May 12, 2010, Dr. Serpe found "moderate 1st MTP tenderness" and "generalized pain in the area of the first metatarsal." (R. at 521.) Dr. Serpe assessed Mrs. Cowen as suffering from non-insulin dependent type II diabetes and neuropathy, idiopathic, peripheral, NOS. (R. at 521.) On April 14, 2011, a view of Plaintiff's foot revealed "[m]oderate calcaneal spurring" and "[d]egenerative change of the talonavicular joint." (R. at 499.) On April 20, 2011, Dr. Serpe found Plaintiff experienced "moderate 1st MTP tenderness." (R. at 498.) Dr. Serpe diagnosed Plaintiff as suffering from, interalia, uncontrolled type II diabetes; diabetes mellitus with neurologic manifestations; and neuropathy, idiopathic peripheral, NOS. (R. at 498.)

On June 8, 2011, Dr. Serpe completed an RFC questionnaire. (R. at 511-12.) He diagnosed Mrs. Cowen as suffering from foot

pain and tenosynovitis. (R. at 511.) Dr. Serpe noted Mrs. Cowen's symptoms included experiencing pain in her feet while walking, he opined that she often experienced symptoms associated with her impairments that were severe enough to interfere with the attention and concentration required to perform simple work-related tasks. *Id.* Moreover, he opined that Plaintiff would need to recline during the day in excess of two fifteen minute breaks and a 30-60 minute break; and that she would need to take unscheduled breaks hourly for 10-15 minutes in an eight-hour workday. *Id.*

Dr. Serpe did not feel, however, that Mrs. Cowen required a job that permitted her shifting positions at will from sitting, standing, or walking. (R. at 511.) He noted she could likely walk less than one city block without rest or significant pain; sit for 60 minutes at one time; stand/walk for 10 minutes at one time; and stand/walk for 1 hour in an eight-hour workday. *Id.* Furthermore, Dr. Serpe opined that plaintiff could occasionally lift 10 pounds; she would likely be absent more than four times a month due to her impairments or treatment; and that she was not a malingerer. (R. at 512.)

On August 3, 2011, Mrs. Cowen was treated by Dr. Serpe. (R. at 514-15.) On examination, Dr. Serpe found that she experienced "[p]ain on palpation to the first metatarsocuneiform joint right foot." (R. at 514.) Dr. Serpe diagnosed her as suffering from

17

pain in her joint, ankle and foot, and recommended she stay in the cam walker. *Id*. He noted that "[c]onsidering her smoking and current condition," he did "not think she is a good candidate for surgical intervention." *Id*. He offered her a second opinion, to which she declined; he noted she will remain in the boot and "follow in one month." *Id*.

### iv. Dr. Cannonie of Provena St. Mary's Hospital

Throughout 2009, Mrs. Cowen was treated by Michael Cannonie, D.O. (R. at 324-35.) On July 14, 2009, Mrs. Cowen presented to Dr. Cannonie to follow-up on her sugar levels. He noted the following: "she has been eating [a] very unhealthy diet. She continues to smoke. She continues to lack any formal exercise. She does admit to having some chronic back pain and she is currently taking exceeding doses of Naprosyn beyond her prescription…" (R. at 332.) Dr. Cannonie diagnosed Mrs. Cowen as suffering from, inter alia, insulin-dependent diabetes, chronic back pain, "[b]ilateral knee pain . . . most likely due to degenerative disc disease[;]" depression; and hypertension. (R. at 324-26, 329-30, 332, 334-35.) On September 21, 2009, an x-ray of Plaintiff's chest revealed "[m]ild degenerative changes in the thoracic spine." (R. at 380.)

### v. Consultative Examiners

On May 17, 2010, Mrs. Cowen was evaluated by consultative examiner Sarat Yalamanchili, M.D. (R. at 391-94.) On

examination, Dr. Yalamanchili found that Plaintiff experienced mild difficulty walking on her toes; walking on heels; and hopping on one leg, however, she had no difficulty getting on/off the exam table; tandem walking; needing the use of an assistive device; and only minimal issue squatting and arising. (R. at 393.) Dr. Yalamanchili noted that Mrs. Cowen's "symptomatology consists of fluctuating blood sugar." (R. at 394.) During her clinical exam, he assessed that her "ranges of motion of all extremities are normal, including lumbar spine and straight leg raising test. Patient's gait was steady with no need for any cane during gait examination. Cardio pulmonary examination is compensated at the present time." *Id.* He diagnosed Mrs. Cowen as suffering from type two diabetes; depression; obesity; panic attack; and anxiety disorder. *Id.*

On May 25, 2010, Mrs. Cowen was evaluated by consultative examiner Erwin J. Baukus, Ph. D., for a psychological examination. (R. at 398-402.) On examination, Dr. Baukus found that her mood "was mildly depressed[;]" "[s]he was unable to repeat 5 digits backwards[;]" she "had difficulty in Serial 7's[;]" and her judgment was found to be "inadequate with the 'fire in the theater' question stating that she would 'Scream.'" (R. at 401-02.) Mrs. Cowen reported to Dr. Baukus that she could not find her Cymbalta so she brought her husband's, as he takes the same thing. (R. at 398.) Dr. Baukus noted that her being

19

unable to find one of her medications " raises the question of compliance." "The number of doses remaining in some medications is not consistent with fill dates and dose prescribed, giving further concern about lack of consistent compliance." *Id.* He diagnosed Mrs. Cowen as suffering from dysthymic disorder; panic disorder without agoraphobia; and
generalized anxiety. (R. at 402.)

On June 23, 2010, State agency review physician Kirk Boyenga, Ph. D., completed a psychiatric review technique form and a mental RFC assessment form. (R. at 411-28.) Dr. Boyenga diagnosed Mrs. Cowen as suffering from "major depression vs. dysthymia vs. partial remission with [prescription;]" and mixed anxiety disorders. (R. at 414, 416.) Dr. Boyenga opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace; no episodes of decompensation; and mild restriction of activities of daily living and maintaining social functioning. (R. at 421.) He found Mrs. Cowen moderately limited in her abilities to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting.

(R. at 425-26.)    Finally, Dr. Boyenga concluded that on examination, Mrs. Cowen is:

> fully oriented and free of thought disorder or serious memory problem. She can also care for 2 disabled sons, do chores, make purchases and pursue hobbies. Claimant is capable of performing simple tasks. Social skills are impaired, but allow settings with reduced interpersonal contact. Claimant is able to retain friendships and get along with family. Adaptation abilities are also limited, but allow routine, repetitive tasks. Claimant is able to follow directions and leave home alone.

R. at 427.)

IV. ALJ's Decision

The ALJ issued her decision on November 7, 2011, finding that, based on Mrs. Cowen's application for a period of disability and disability insurance benefits, she was not disabled under sections 216(i) and 223(d) of the Social Security Act. Additionally, based on her application for supplemental security income, she was not disabled under section 1614(a)(3)(A). (R. at 36.) The ALJ applied the five-step sequential analysis as required by the Act, under 20 C.F.R. 404.1520(a). At step one, the ALJ determined that Mrs. Cowen had not engaged in substantial gainful activity since October 1, 2005 (the alleged onset date). (R. at 12.)

At step two, the ALJ determined that Mrs. Cowen had several severe impairments: diabetes mellitus with neuropathy, obesity, depression, anxiety, tenosynovitis of the right foot,

21

degenerative disc disease of the lumbar and cervical spine. (R. at 23.)

At step three, the ALJ determined that Mrs. Cowen did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments from 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). (R. at 24.) She noted that "[d]espite having more recent problems with her right foot and wearing a boot for the past few months, there was no support from the medical evidence that claimant could not ambulate. Therefore, when examining the claimant's obesity in conjunction with the claimant's other severe impairments, I find that none of the above listings have been met or equaled." And that the "severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04 and 12.06." (R. at 24.)

At step four, the ALJ concluded that, although Mrs. Cowen was not capable of performing her past work as a bus driver or machine packer, she had the RFC "to perform less than the full range of sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a). She can occasionally climb ramps and stairs but never ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. She must avoid concentrated exposure to extreme cold and heat, wetness, humidity and fumes.

She is limited to unskilled work tasks that can be learned by demonstration or in 30 days or less. (R. at 26.)

In making her decision, the ALJ noted that she considered all of Mrs. Cowen's symptoms, and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, as required under 20 C.F.R. 404.1529 and 416.929, as well as SSR's 96-4p and 96-7p. *Id.* Additionally, the ALJ considered opinion evidence in accordance with 20 C.F.R. 404.1527 and 416.927, and SSR's 96-2p, 96-5p, 96-6p, and 96-3p. *Id.* Next, the ALJ summarized Mrs. Cowen's testimony and medical record and stated:

> I have given the claimant the benefit of the doubt and considered her intermittent physical complaints of pain combined with her obesity and mental health symptoms and limited her to sedentary work. I find that the sedentary exertional level is more consistent with the overall medical evidence and combination of mental and physical conditions.

(R. at 33.)

At step five, the ALJ determined that, based on Mrs. Cowen's age (which is defined as a younger individual age 18-44), education, work experience, RFC, and the VE's testimony, "there are jobs that exist in significant numbers in the national economy that the claimant can perform..." (R. at 34.) The ALJ determined that Mrs. Cowen would be able to work as a callout operator (1,200 regionally/35,000 nationally), telephone quote

clerk (900 regionally/10,000 nationally) or addresser clerk (1,000 regionally/70,000 nationally). (R. at 35.)

Mrs. Cowen requested review by the Appeals Council, but was denied on July 23, 2012. Thus, the ALJ's decision became the final decision of the Commissioner. Mrs. Cowen filed a complaint with this court on September 21, 2012, seeking a review of the decision. The parties consented to exercise of jurisdiction by a magistrate judge on November 9, 2012. Thereafter, cross-motions for summary judgment were filed. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). Mrs. Cowen asks the Court to reverse the Commissioner's decision denying her benefits, or to remand the matter for further proceedings; the Commissioner seeks summary judgment affirming the agency's decision.

## Standard of Disability Adjudication

An individual claiming a need for DBI or SSI must prove that he has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must

24

evaluate whether the claimant can perform his/her past relevant work, and fifth; the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405 (g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990).

An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is insufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

<u>Discussion</u>

Mrs. Cowen argues that the ALJ's decision should be reversed or remanded because the residual functional capacity finding is unsupported by substantial evidence; the credibility determination is unsupported by substantial evidence; and the Step 5 determination is unsupported by substantial evidence. The Court will address each complaint in turn.

*I. The ALJ's RFC Finding*

Mrs. Cowen argues that the ALJ erred by affording only "some weight" to her treating physicians, as well as by failing to reconcile the State agency review physician, Dr.Boyenga's, opinion with her RFC determination. Mrs. Cowen asserts that Dr. Serpe's and Dr. Belford's opinions should have been afforded greater weight because their opinions were consistent with substantial evidence in the record, and that "[a] treating physician's opinion regarding the nature and severity of a

26

medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

The ALJ found that Mrs. Cowen had the RFC to perform less than the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a) (R. at 26.), with additional postural and exposure limitations. Further, the ALJ determined that Plaintiff was limited to unskilled work tasks that could be learned by demonstration, or in 30 days or less. *Id*. The regulations provide that a claimant's RFC is assessed "based on all of the relevant medical and other evidence" of record, 20 C.F.R. § 404.1545(a)(3), and the final responsibility for determining a claimant's RFC is reserved to the Commissioner, 20 C.F.R. § 404.1527(e)(2).

Plaintiff argues that the ALJ erred in giving only "some weight" to the opinions of treating physicians Drs. Serpe and Belford. However, a treating physician's opinion may merit "controlling" weight only if it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th

27

Cir. 2010). The Seventh Circuit has "disapproved any mechanical rule that the views of a treating physician prevail." *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001).

The Court finds that herein, the ALJ thoroughly examined the evidence of record and reasonably determined that Drs. Serpe and Belford's opinions were entitled to only "some weight." (R. at. 33.) The ALJ points out that Dr. Serpe's opinion was largely consistent with a finding that Plaintiff was capable of sedentary work: he indicated that Plaintiff could sit for 60 minutes at one time and eight hours during an eight-hour workday; she could stand/walk for ten minutes at a time and for a total of one hour in an eight hour workday; and she was capable of lifting and carrying ten pounds occasionally (R. at 511-12.) As defined in the regulations, sedentary work involves lifting no more than ten pounds at one time and occasionally lifting or carrying articles like files, ledgers, and small tools. 20 C.F.R. § 404.1567(a). It also requires sitting with occasional walking or standing. *Id*. The Court finds that Dr. Serpe's evaluation of Mrs. Cowen puts her within the bounds of sedentary work and fits well with the ALJ's RFC determination that Plaintiff could perform less than the full range of sedentary work due to postural and exposure limitations.

Plaintiff's assertion that the ALJ failed to reasonably weigh Dr. Belford's opinion is equally without merit. After a review of all of the medical evidence regarding Plaintiff's mental condition, the ALJ concluded that the opinion of Plaintiff's treating psychiatrist, Dr. Belford, was only entitled to "some weight" (R. at 33.) Dr. Belford completed two Mental Capacity Assessments – one on February 16, 2010 and the other on March 15, 2011 (R. at 266-68, 490-92.) The two assessments were largely the same with some improvement noted in the 2011 opinion. Dr. Belford opined that Plaintiff had a few marked limitations in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation (R. at 490-92.) She also stated that Plaintiff would miss more than four days of work a month. (R. at 491.)

The ALJ reviewed these opinions, gave them some weight, and, as a result, limited Mrs. Cowen to unskilled work tasks that could be learned by demonstration in 30 days or less (R. at 33.) She gave specific reasons for weighing Dr. Belford's opinions this way, noting that Plaintiff had family and situational stressors, but that the record showed that Plaintiff's mental health condition improved with both medications and counseling (R. at 33.) For example, when Plaintiff was taking her medications as prescribed, she found that she was more in control

29

of her emotions, was able to get more sleep, had less depression and anxiety, had better moods, was able to control her irritability and temper, and had better relationships with her children and husband (R. at 284-85, 288-91, 297-300, 303-07, 312-13, 505-06.) Moreover, the ALJ pointed to the fact that Dr. Belford's treatment records noted that Plaintiff completed normal daily activities and expressed frustration that she was the only one in her household who took responsibility for these tasks (Tr. 30, 295). The ALJ explained that there was no indication in any treatment notes that Plaintiff was incapable of working and that both she and her husband reported that she did not have any trouble getting along with other people (R. at 30, 33, 214-15, 227, 400-01.)

Plaintiff contends that several other doctors diagnosed Mrs. Cowen with depression and anxiety disorders. Pl's brief. at 11. However, a mere diagnosis does not lend support to a finding of disability. *Orlando v. Heckler,* 776 F.2d 209, 214 (7th Cir. 1985). Further, the records that Plaintiff cites all discuss how Plaintiff's mental symptoms were under control when she took her medication. For example, Dr. Yalamanchili diagnosed Plaintiff with depression, panic attacks, and anxiety disorder, yet found that she had a normal mental status and that she stated during her exam that her depression and anxiety disorder were better

with medication.  (R. at 391, 394.)  Similarly, Dr. Maly noted
that Mrs. Cowen was being treated for depression, but noted that
she thought that her depression was under control (R. at 473.)
And, although the ALJ found Dr. Belford's opinions to be too
restrictive and unsupported by the evidence, she took them into
consideration when determining Plaintiff's RFC, limiting Mrs.
Cowen to unskilled work tasks that could be learned by
demonstration or in 30 days or less (R. at 33.)

Lastly, Mrs. Cowen argues that the ALJ afforded
"considerable weight" to the opinions of Dr. Boyenga, a state
agency examining psychiatrist, yet failed to reconcile his
opinion with the RFC determination.  Pl's brief. at 12.  Dr.
Boyenga determined that Plaintiff was capable of routine,
repetitive tasks and could follow directions.  (R. at 34.)  The
regulations instruct that state agency consultants are "highly
qualified physicians and psychologists who are also experts in
Social Security disability evaluation." 20 C.F.R. §
404.1527(e)(2)(I).  The Seventh Circuit has held that reliance on
such physicians is appropriate because "[t]he fact that these
[reviewing] physicians reviewed the entire record strengthens the
weight of their conclusions." *Flener ex rel. Flener v. Barnhart,*
361 F.3d 442, 448 (7th Cir. 2004).  The ALJ gave Dr. Boyenga's
opinion considerable weight because it was consistent with the

record as a whole (R. at 34.)

Dr. Boyenga noted that Mrs. Cowen improved with treatment;
was fully oriented and free of thought disorder or serious memory
problem; that she cared for two disabled sons, took care of her
home, and pursued hobbies; and that her social skills were
impaired, but that she was able to retain friendships and get
along with her family. (R. at 411, 414, 416, 427.) Dr. Boyenga
both reviewed the record and examined Mrs. Cowen, and the ALJ
considered his opinion's support and consistency in light of the
whole record. 20 C.F.R. § 404.1527(d)(3), (4).

Mrs. Cowen argues that the ALJ erred by not accounting for
the social functioning limitations in Dr. Boyenga's opinion.
Pl.'s brief at 12. The Court agrees that the ALJ's RFC does not
contain an explicit social functioning limitation; however, the
ALJ did not adopt Dr. Boyenga's opinion fully. Rather, she gave
it "considerable" weight (R. at 34.) The Court finds the ALJ to
have reasonably considered Plaintiff's ability to interact with
others in her decision. At the hearing, the ALJ included social
functioning limitations in her hypothetical questions to the
vocational expert that were more restrictive than the limitations
suggested by Dr. Boyenga even. (R. at 75.) The ALJ asked the
vocational expert to describe the jobs available to someone with
Plaintiff's RFC who had the further limitations of only having

occasional contact with the general public, supervisors, and co-workers. *Id.* The vocational expert maintained that even with these restrictions there were a significant number of jobs in the national economy available. (R. at 75-76.) Thus, even if the ALJ committed error by not explicitly articulating a social functioning limitation in her RFC finding, that error was harmless. *Shramek v. Apfel*, 226 F.3d 809 (7th Cir. 2000) (affirming ALJ's decision despite errors because none of the errors ultimately impacted the outcome).

The Court finds that the ALJ had a substantial amount of evidence to find Mrs. Cowen not disabled, including multiple medical opinions, treatment and examination notes, objective medical evidence, as well as Plaintiff's daily activities and record of spotty compliance. Plaintiff's arguments fail to overcome the substantial evidence supporting the ALJ's assessment of the record. The ALJ built an accurate and logical bridge from the evidence to her conclusion, and, thus, the Court must affirm her decision.

## II. The ALJ's Credibility Determination

Next, Mrs. Cowen challenges the ALJ's finding that her complaints of debilitating limitations were not fully credible, mainly arguing that the ALJ erroneously identified

inconsistencies between her limitations and her activities of daily living. Pl's brief at 13.

Because an ALJ is in the best position to assess the credibility of a claimant, a court will afford the ALJ's credibility assessment special deference, and will only find against the credibility assessment where it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). An ALJ's credibility assessment is "patently wrong" where it "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir.2008). In making this assessment, a court will not "nitpick the ALJ's opinion for inconsistencies" but rather "give it a commonsensical reading." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir.2010).

A "commonsensical" reading shows that the ALJ gave many reasons for rejecting Plaintiff's allegations of disability, including the fact that Plaintiff's allegations were inconsistent with the medical evidence, her daily activities, and her unremarkable physical and mental examinations. (R. at 31.) In addition, substantial evidence of Plaintiff's non-compliant behavior undermines her credibility and her allegations that she is unable to work (R. 30-33.)

Plaintiff argues that the ALJ erred by focusing too heavily on her daily activities in finding her not credible, and that she

improperly weighed those activities since they were not equivalent to full-time work. However, while courts have questioned whether some daily activities really indicate that a claimant is unable to work outside of the house, an ALJ is allowed, and obligated by the regulations, to consider whether a claimant's daily activities are inconsistent with her stated ability to work. *See Oakes v. Astrue*, 258 F. App'x 38, 43 (7th Cir. 2007); 20 C.F.R. § 404.1529(c)). Herein, the ALJ reasonably pointed out that Plaintiff's activities of daily living were "inconsistent with her severe complaints." (R. at 32.) The ALJ noted that Mrs. Cowen cared for her mentally impaired sons and ill husband, took care of financial matters, and performed household chores (R. 25, 32.) These activities were inconsistent with Plaintiff's allegations of poor concentration and her claims that she did not do much all day. Mrs. Cowen counters the ALJ's reasoning by pointing out that the "differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). While true, Plaintiff's activities of daily living were not the only thing the ALJ considered in determining that Plaintiff was not entirely credible.

35

Critically, the ALJ noted that Plaintiff's history of non-compliance with doctor's orders and her huge gaps in seeking treatment additionally belie her claims that her impairments are disabling. *Ehrhart*, 969 F.2d at 538 ("The Secretary may not find total disability when a claimant inexcusably refuses to follow a prescribed course of medical treatment that would eliminate his total disability.") (citations omitted). Specifically, Plaintiff failed to wear the diabetic shoe that was recommended by her treating podiatrist for years, refused to undergo physical therapy, and consistently ran out of her medications and failed to take them as prescribed (R. at 272-83, 297-98, 308-11, 398, 444-46, 518-19, 527-32.) Mrs. Cowen also had large gaps in her treatment record. While she complained of pain, she went many months without seeking any treatment (R. at 466, 468, 475, 479-77, 518-21, 525-28, 533-34.)

The Court finds that substantial evidence exists that could reasonably indicate to the ALJ that Plaintiff's symptoms were controlled and that she did not need advanced treatment (R. at 28-29.) *See Walker v. Bowen*, 834 F.2d 635, 644 (7th Cir. 1987) (where claimant sought only routine care for a six month period, it was suggestive of no serious medical difficulties during that period). The ALJ's credibility determination was in no form "patently wrong," and therefore the Court must give deference and

36

support to her finding.

### III. *The ALJ's Step Five Assessment*

Finally, Mrs. Cowen argues that the ALJ's Step 5 determination is unsupported by substantial evidence because the ALJ failed to consider all of her limitations, and, therefore, asked the VE an incomplete hypothetical question. She asserts that the hypothetical posed did not include Dr. Boyenga's opinion of her limited social skills, nor did it include Drs. Serpe or Belford's opinion of her marked limitations. Defendant contends that only the limitations supported by the medical record need be included, and that although the ALJ declined later to include some limitations in her RFC, she questioned the vocational expert as to all of her limitations.

"Hypothetical questions posed to vocational experts ordinarily must include all limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Plaintiff's underscoring of this rule is appropriate, albeit misplaced, as the Court finds that the medical evidence did not fully support the opinions of Drs. Serpe and Belford. Thus, the fact that the ALJ did not include every limitation that those doctors suggested in her hypotheticals was not error.

Moreover, the Court finds that, although she decided on not including such limitations in her final determination of Plaintiff's RFC, she still questioned the vocational expert as to whether the number of jobs would change if an individual was limited to "occasional contact with the general public and occasional interactions with supervisors and co-workers," an accommodation Dr. Boyenga noted. (R. at 75.) The vocational expert concluded that Mrs. Cowen could still do one of the jobs that the ALJ specifically listed in her decision at Step Five (an addresser clerk) and further stated that there were an additional 50,000 jobs nationally that a claimant with these limitations could perform (R. at 35, 75-76).

Further, the ALJ included the unscheduled and excess break times and absences that were included in both Drs. Serpe and Belford's opinions when questioning the vocational expert (R. at 76.) Lastly, the ALJ referenced Dr. Belford's opinion that Plaintiff had limited attention and concentration in her hypothetical by limiting Plaintiff to unskilled work that could be learned by demonstration or in 30 days or less (Tr. 71). The Court finds that the ALJ's step 5 determination was supported by substantial evidence, no harm occurred by her not addressing every limitation, and that her final RFC determination fits accordingly with her step 5 determination.

The ultimate question before the Court is whether the ALJ reasonably weighed the evidence presented to her. The Commissioner is responsible for weighing the evidence and making independent findings of fact; as such, a reviewing court may not decide the facts anew, re-weigh the evidence, or substitute its own judgment for that of the Commissioner. *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999) (citing *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995)). Mrs. Cowen's complaint does not show that the ALJ's interpretation of the evidence was unreasonable or that she ignored material evidence. Accordingly, the Court finds that the ALJ's decision, which reasonably accounted for Plaintiff's impairments, was supported by substantial evidence.

### Conclusion

For the reasons set forth above, the Court grants the Commissioner's motion for summary judgment [#27], and denies Mrs. Cowen's motion for summary judgment [#19]. The decision of the Commissioner is affirmed.

Date: November 13, 2013

E N T E R E D:

_____

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT